Good morning, Your Honor. Cheryl Orr, Music Peeler and Garrett on behalf of Appellant Aspen Insurance UK Ltd. Briefly, on the motion of transfer, we believe the Court abused its discretion. It allowed the defendants to use the removal and the transfer statutes to form shop to get the case to California. Why is that property for us? Because I don't think it was part of what was certified to us. So why is that? I noticed that none of the parties addressed that, but I'm not sure we have jurisdiction to cover that. Well, we cited the All Writs Act as the authority of this Court. Yeah, but I mean the standard is basically a mandamus standard. So you think this meets the mandamus standard? I do believe it's a clear abuse of discretion. Why? The mandamus standard is not an abuse of discretion. Manifest. And so did you even argue that it meets the actual mandamus standard? You did argue that it was abuse of discretion, but did you argue? We did say it was a manifest abuse of discretion, I believe, in the standard of review section. We submit that the question that Van Dusen presents is that you have to show it's a more convenient forum. And under 1404A, you have to show good cause for more convenient for the witnesses and the parties. Well, they never met this standard at all. The Court didn't hold them to the standard. At AER 18-19, the Court said they didn't meet that standard, but the Court moved on and said it was a neutral factor. The convenience, more convenience, is a requirement of the statute. If you don't show that the other transferee forum is more convenient, you don't show good cause under 1404A. And I'll submit on that that that is where the Court did not follow Van Dusen and did not follow the Decker-Cole case, because the Court said if you don't show a more convenient forum, if it just shifts the cost, doesn't eliminate the extra cost, then you don't meet the standard. Right, but I think we're again jumping the gun here in arguing the merit of whether the standard is met, because mandamus relief, you have to show that extraordinary circumstances, otherwise we don't hear the appeal. Well, Your Honor, I think that this was extraordinary in the sense that it was used exactly for the purpose of forum shopping in violation of the Van Dusen statute to get the California Insurance Code statute to apply. And with that, I will submit on that question and I'll move on to the statutory question, because it's clear that the District Court erred in applying California Insurance Code 11580.9. 11580.9 does not govern a dispute between a true primary insurer and an excess insurer. And NIIC is a true primary insurer. It has first dollar coverage, has an obligation to defend. When the tender was made by Weyerhaeuser to NIIC, that coverage under that primary policy attached upon the tender. In contrast, the Aspen policy does not attach until $10 million in loss has been paid by Weyerhaeuser or its available insurance. That didn't happen until the settlement of the Afaro case. And when, at that point, Aspen had to come in and pay $7.5 million because another $10 million had already been paid by Weyerhaeuser and $1 million by NIIC under the primary policy. That's the distinction here. The Court failed to recognize that 11580.9 applies to disputes between primary auto insurance carriers that were relying upon other insurance clauses to make their policies incidental excess policies and not to a situation where you're dealing with a true primary and an excess insurance policy, another attachment point. They do not apply at the same risk level and they don't apply to the same risk. They're different risks. As I mentioned earlier, upon the tender of that Afaro lawsuit, the coverage under the NIIC primary policy attached immediately. The coverage under the Weyerhaeuser policy did not attach until the $10 million in loss had been paid under the terms of that policy. So this is a situation where they are not co-insurers. They do not apply to the same loss and so the language of 11580 does not apply. With respect to the insurance coverage dispute between Weyerhaeuser and Aspen and the defendants who were named in the original complaint, they were all excess insurers. So the issue was all excess insurers, how do we decide this coverage dispute? That's a matter of priority of law under California case law. 11580.9 does not apply to the dispute between excess insurers and that's another distinction here. I think if you look at the cases that we cited, the Sequoia case, the Continental case and the American Alternative case all stand for proposition that when you have the dispute between the primary carriers pointing fingers at one another saying I don't have a primary obligation here, that's what 11580.9 addresses. It does not address a situation where you have different insurers at different levels or all excess insurers talking about what their obligations are to one another or to their insured in a particular circumstance. Why does 11580.9 exist? Why was that passed? It was passed in 1970 to deal with the situation where you have auto liability insurance policies. You might have a primary insurance policy over like the one type of driver and a primary insurance policy on another driver or you might have a primary insurance policy over the cab and a primary insurance policy over a rig and you might have these competing primary insurance claims where they're saying I don't have the primary obligation. So in that situation, if no primary carrier steps up, the assured is not given a defense and would have to sue the insurance companies to get a defense while all the insurance companies are pointing at each other and saying not me, I'm primary because I have other insurance clause that says I am excess to when there's other primary insurance. So the way you just explained it, it's not particularly intuitive that that's what it was meant to address with all these different types of primary insurance covering the automobile because what it picks as the primary essentially is between basically motor vehicle insurance and premises insurance. Well, in subsection C, that's the choice. The other subsections deal with specific circumstances. So there are four different circumstances, A, B, C, and D. Maybe I should make clear my question was specifically about C because that's what I thought we were, that's what the district court concluded applies here. But what was the purpose of the California legislature? Why did they pass that? Well, the intent was to deal with the premises of being a primary insurer versus an auto policy being a primary insurer. I mean, I'm looking at the statute language and I'm not, it doesn't say primary, it just says we're two or more policies. So why do we read in primary policies? Well, if you look at the legislative history which was presented. I'm looking at the text. And if you hold on your honor, I will pull my statute up. And this specific reference you see later in the law is the reference to where two or more policies are applicable to the same loss and then you read down and it says the one covering the premises shall be excess over other valid and collectible insurance applicable. And then at the end it says. Well, I'm reading the part and here's where I would like you to focus on. When two or more policies are applicable to the same loss, it shall be conclusively presumed that the insurance afforded by the policy covering the motor vehicle shall not be primary. Right. What do we do with that language? Because it talks about primary, okay? An excess policy does not have the same risk level as a. Two policies applied to the same loss. And then later. Priority, right? The motor vehicle policy is not the primary policy. But your honor, further down it talks about they shall not be concurrent. So on the text here is your position must be that the two or more policies applicable to the same loss that somehow built into applicable to the same loss as some primary concept. Yes, because it talks about primary. And if you look at the statutory. It just goes on later to say something won't be primary. But here it just says two or more policies are applicable to the same loss. Applicable to the same loss seems pretty broad on its face. Like whether something was primary or not, it would still be applicable to that loss. I think you have to also look at how this has been interpreted, not only when it was first enacted. When it was first enacted, the Ohio casualty case talked about co-insurers. Co-insurers applied to the same loss. Co-insurers applied to the same risk. Co-insurers have to have the same risk level. So at the time this was enacted, they were talking about concurrent. If you read further down in the section, they talk about the two or more policies shall not be construed as providing concurrent coverage. So when you read that text, you have to consider the whole context of the statute. And when it talks about concurrent coverage, then that's what gets you to the point to say that these policies that they were talking about in subsection C were concurrent coverages that provided the same primary, but because of the statute, that makes one of those primary policies access to the other primary policy. Thank you, counsel. Let's give us some more chance. Good morning. May it please the court. Michael Moore for Appellant Weyerhaeuser Company and Weyerhaeuser NR. I'm just going to pick up right where Your Honor left off. This is a statutory interpretation case. The issue before the court is purely legal. It's about what this statute was intended to mean. It is intended to address a situation, as the court just pointed out, where you have concurrent policies covering the same loss. The language of the statute speaks in terms of policies. And so the error the trial court made, Judge Frink-Pahn prospectively made, was applying the statute to a self-insured retention that was merely referenced in the Aspen policy. So Weyerhaeuser, while we're co-appellants, we stand in a pretty remarkably different position. The narrow question as to Weyerhaeuser is whether Weyerhaeuser's $10 million self-insured retention, a retention that was just merely referenced in the Aspen policy as an attachment point for the Aspen coverage, whether that self-insured retention constitutes an actual policy of insurance. And respectfully, I think the running through three cases just very quickly. If I understand correctly, I think in response to one of the, to a case, the statute was later changed to make it so that if you're self-insured and if you're self-insured and and you go and you get a certificate that says you're self-insured, which I assume you need that certificate in order to operate because, you know, California law requires you to be insured. So you can self-insure, but you have to get the certificate. If you do that, then you then you are, if you're fully self-insured in that sense. Yeah, your honor's correct. That's a particular type of self-insurance. And you, you distinctly say, we're not that. But I don't understand why that wouldn't help. And that was in response to some California cases that said, that accepted your argument with regard to full self-insurance, not, not. Yeah, respectfully, this, this concept of full self-insurance versus something less than full self-insurance, that is a concept that does not exist in California. Well, it sure does. It sure does. Because, you know, I mean, I don't, I don't own a trucking or, or, or a logging company, but I do have car insurance and we all do, and they have deductibles. So this, this, this self-insurance, this, this self-insured retention is basically a deductible. It's basically saying we'll pay the first 10 million and then, and then our insurance picks up. California law actually draws a distinction between deductible and an SIR and indicates that an SIR is actually outside of the policy while the deductible is within the policy. We'll get to that. I guess I just, because we don't have our time trying to make sure. It seems like if California has said, listen, if you're fully self-insured, you're not talking about something akin to a deductible. Yes. But we're talking about, then we are going to treat you like you are, like you are, have an insurance policy and we're going to make you step in first under this statute. I would absolutely agree with that concept. And so why wouldn't sort of, that same sort of rationale mean that if you have essentially a deductible, we're going to make you pay your deductible? I don't understand the argument that that case law helps you. Yeah, they're different situations. And I'll just use the concept that you, you defined. Full self-insurance versus something like a deductible. And again, we'll get to the, the Deere case that really addresses this issue head on. The full self-insurance concept, there is, we had U.S. Metro that came out said 11580.9 doesn't apply to self-insurers. The legislature recognized there was one type of self-insurer that should apply to fully self-insurers who have a fleet of vehicles that go out and prove they have the economic, the financial resources to pay for damages from auto accidents without having self-insurance. And they make that submission to the California court, or excuse me, to California, and they receive this particular type of self-insurance certificate back. In that situation, they're not required to go out and secure auto insurance. And so they, they stand in the shoes of a normal auto insurer because they have complied with that statutory regime. So it's a different situation. So when you're saying full, fully self-insured, you're talking about a situation where someone has actually complied. So why do you think California responded to this case and, and amended it to have these people that I call fully self-insured, whatever, to put them, make, say they will be, they will still be priority. They will be priority over, over the premises. California law otherwise requires automobile owners to have auto insurance. There is a particular exception to that requirement. The reason I'm asking that is similar to the question I was asking your, your colleague who was arguing before you, which is, well, I'm trying to figure out like what the reason for C is. The reason is, the reason is because those fully self-insured entities, a company that has 30 vehicles is getting the benefit of not securing insurance coverage. Well, so is, so, so is, so is your company. If you, yeah, no, I mean, the work around, around California, having done what they did is to say, well, we just won't be, we'll have a $50 trillion self-insured retention and a $5 coverage above that. And that gets us the same, that, that's how we get around what California did. Respectfully, I disagree, your honor. I mean, you're really cheap insurance, like that'd be really cheap insurance. That'd be a really cheap policy. Well, to follow up on that point, I mean, the self-insured portion, isn't that, I mean, of course the insurance company is thinking about that when they're figuring out what the premium is going to be. So it's not entirely outside of the insurance policy. You know, respectfully, the, the case law in California has already addressed this issue. And we, we have the case that all the parties rely on. It's the Deere case. It is the case that the district court relied on outlining this concept of, that because an SIR is referenced in the policy, it must be considered part of that policy despite what the statute said. And what that case actually indicates is that an SIR is not insurance. So the trial court, the district court relied on kind of cherry picking this one statement that an SIR is considered part of the policy, but ignored the holding of the case. And the holding of the case is, quite frankly, crystal clear. The court of appeals indicated that the term retention or retained limit refers to a specific sum or percentage of a loss that is the insured's initial responsibility that must be satisfied before there is any coverage. So the question is, is the SIR a policy of insurance? And the California court of appeals has already addressed that question and ruled conclusively. The question is, is the SIR part of the, of the Aspen policy? Yeah, so let's take that apart, right? To use your deductible analogy, you talked about, you have a medical procedure, $500, right? Excuse me, your medical procedure is $5,000. You have a deductible in your policy of $500, right? All the deductible is signifying is the attachment point for actual insurance. Before that attachment point, you don't have insurance coverage. And that's what Deere specifically says. That before the SIR is satisfied, all that denotes, all that SIR denotes, is the attachment point for actual insurance coverage. So the reference in the policy is not an indication that you have insurance coverage. It's a reference to the attachment point of the actual insurance coverage. And again, Deere specifically says that. So this was not an unsettled issue. It's just an issue that the trial court respectfully got wrong. Can I switch gears here? I want to talk about the conflict of law. You haven't asked about, or you haven't argued that issue. I assume you're still pursuing it. Yes, and I guess there's one point. I can boil it down for you. I'm not sure why the district court was focused at all on the underlying injury and accident. It seems to me that this is an insurance dispute. And so we care about the relationship that the forums have to the insurance dispute, which has nothing to do with the underlying accident. Am I wrong about that? You're not. We cited the MKB case, which is a district court opinion from Judge Robart in Washington, lays out the analysis in an insurance coverage dispute exactly as Your Honor just described. So if we set aside the underlying accident, what are Washington's contacts to this insurance dispute? Because none of these insurers are in Washington. The primary insured is not in Washington. So what is the Washington connection? The primary insured, Weyerhaeuser, well, Weyerhaeuser is the additional insured. And we know that you evaluate an additional insured's right to coverage independently from the primary insured. So Your Honor is correct. When you're looking at extra contractual bad faith claims, you're looking at the contacts between an insurer on one hand and the insured or potential insured on the other. So you have Weyerhaeuser in Washington. We have the certificate of insurance being delivered in Washington. We have what we allege is bad faith conduct originating from states other than Washington, but not originating from California. We have those, what we consider to be bad faith. Was there a certificate of insurance delivered? I'm trying to remember, because, you know, there's all this stack of insurance for the, was it just the first level that provided a certificate of insurance? I think it was the primary, but to be honest, Your Honor, I don't recall. But I mean, that would seem to matter here, especially if you're trying to rope in the other ones as far as contacts. Like, you know, their argument is we didn't even know about this thing existing. Well, the claim had been submitted to them all. Obviously, I think they had issued a certificate of insurance. They would, but like, I don't know. The conduct that we're examining for purposes of the bad faith claim is the communications between the insurers and Weyerhaeuser. Weyerhaeuser is in Washington. The insurers are outside of California communicating, again, what we consider to be bad. Do we have to get to that if we can tell from the insurance contract that the parties chose California law? You actually don't need to get to the issue at all if you reverse on the priority of coverage statute, because the only conflict... On the choice of law question, under the restatement section 187, if we can tell from the contract that the parties intended to apply California law, do we need to figure out where the primary contacts are? No, but again, I think the MKB case makes it clear that all of the contacts here are either neutral or favor Washington, because we look to the nature of the bad faith claims and the conduct that the insurers delivered to Weyerhaeuser in Washington when assessing that claim. It doesn't matter about the underlying lawsuit. It doesn't matter about where the contract claims originate from. We just look at the extra contractual claims themselves, as Your Honor noted. Thank you. You're a little over time, and you didn't tell me, but I think you told our courtroom deputy you wanted to save a couple of minutes, so I'll put a couple of minutes back on the clock. Thank you. Thank you. Sam Colito. I represent First Mercury Insurance Company and the North River Insurance Company. Before I get started, I'd like to... Remind me again where you are in the stack of these things. We are the top two levels of excess coverage, if that's what you're referring to. Top? The top two levels. Of excess coverage. Of excess coverage. Did not have a primary policy.  Or the... National insurance? No, I am First Mercury Insurance Company and the North River Insurance Company. And this takes me to that next point. I'm going to give a little roadmap. We didn't want to come up here and repeat the same arguments over and over again, so we've divided the issues up among us. I'm going to start and address the choice of law for the contractual issues. My colleague, Mr. Harvey, is going to address the applicability of 11-580. And my colleague, Mr. Gergen, is going to address the choice of law issues for extra contractual claims and any transfer issues. What was the middle fella addressing? I didn't hear. Mr. Harvey is addressing the applicability of 11-580. Okay. And coverage under the policies. So I'm here for choice of law on the contractual issues.  Okay, so that leads me naturally to ask you to pick up where I left off with Mr. Moore. On the, let's see, your First Mercury and North River fourth and fifth level, but on choice of law, are you just relying on the policy with national then? It's the primary policy. Right. Lexington, then the national or state. Are you making the argument that the primary policy contemplates the application of California law? It's not express choice of law, but there are many, many provisions that references arguably contemplating that California law is the only law that the parties intended. The policies tend to sort of follow form down, right? I know they follow form on down. My North River policy follows the... Right, so in looking at the national policy... The primary policy, why don't you just give me your argument on choice of law? Sure. Well, I'd like to focus on the center of the relationship for the contractual issues, which I think gets to your question. And that the center of the relationship for the contractual issues is California. And in fact, the most significant context of California are... I want to nail this down because I'm not sure I'm fully understanding the nature of or what Judge Wynn is getting at. Your argument for why California law should apply is that the parties chose California law to apply, or that the most significant relationship test tells us? The most significant relationship test. All right. If I could clarify, is your argument... I thought that you would have argued that under 187, the parties had already contemplated the application of California laws. We don't even get to the restatement 188, where you're trying to analyze where the significant contacts are. I think your question just sort of solidified for me. There are California-specific endorsements in the national interstate policy that certainly indicate that this was a California policy and an expectation that California law would apply. That's one of the factors, right? Or are you relying... I mean, Judge Wynn is referencing a presumption. Correct, correct. And that's under... We've really only addressed the most significant relationship test, though. But given the contacts with California versus the contacts with Washington, the relationship with California being more significant is fairly clear. These policies were issued to Gardner in California using California brokers. This is sort of the macro factors, right? Not claim-specific. So when the policies were issued by your clients, your clients knew that you were going to be, you know, down in line from first interstate or first... I can't remember what it's called. But the primary access policy, right? You knew that you were downstream from that policy?  And did you know... Did you have access to that policy to know what its terms were? Yes. If not immediately, we would... Yes, because they're scheduled on the policy. Yes. And that policy specifically required Weyerhaeuser to be an additional named insured? It contained a blanket additional insured endorsement. It didn't name Weyerhaeuser. Oh, I thought there was a page in there that specifically named Weyerhaeuser. My recollection is that it was blanket. But if it did specifically name Weyerhaeuser, that, you know, it may have. So you knew that there was an additional named insured involved. You knew that the first line access policy was saying that we're going to be excess unless there's a contract out there that says we have to be primary? Yeah? Correct. Okay. Yeah, I thought maybe there was a consistent... What we said that there was a certificate of insurance, you know, naming them as an additional insured sent to them as opposed to them being named as an additional insured in the policy. And I don't... Would that make a difference for you all having notice about... Specific notice about Weyerhaeuser in the sense that, like, I don't know if you would be copied on that certificate sent, but in theory, you would have access to the... I don't know if the certificate was sent. I don't know if there was one sent for the downstream excess policies. Well, I didn't think there was one sent for you all. I thought there was one sent for the first level. And I don't know if we had access to that. Prior to the claim or after. But your understanding is that the national policy, the first level national policy named, sort of had this language that named people as additional insured broadly, but didn't necessarily name specifically who they each were. Correct. Which, as I understand, would... So you couldn't look at that and go, well, this person's name, they're in, you know, Colorado. So I guess we could expect that Colorado would apply. This person's name, they're in... And providing coverage to an additional insured located in a different state doesn't change the fact that it's a contract issued in California. It's a California contract. They use California brokers. And then from a specific view, we were asked to provide... There's two benefits under a liability policy, defense and indemnity. We were asked to... I know you're out of time, but... So in theory, if you did look at, you know, if they were named and there's names like five different companies, and these five different companies are all in different states, then you could end up in a... And that mattered as opposed to California, where the company that you're actually giving, the gardener, you know, that you're actually giving, then you would end up almost like it'd be a venue clause that pick venues in different states, right? Because you could end up like, you know, if it turned out that the additional insured had a problem and you ended up and they were in Colorado, you end up in Colorado and then you... Is there any case law you know about that talks about... I don't, but I do see a real problem with that approach that could arise from that approach. This claim, we didn't have a claim for our named insured in this case. Gardner wasn't a party in the underlying action, just Weyerhaeuser, just an AI. But often you do have claims for the same loss under the same policies from a named insured and an additional insured. If we were to follow that approach and apply the law, you know, okay, you are the AI, you're in Colorado, you're the NI, you're in California. We've got to adjust your claim under California law, your claim under Colorado law. Well, those states may disagree on pertinent and relevant coverage issues. And so we might not be able to administer equal insurance, give equal consideration to both insureds if we've got to apply sort of whatever law state they're located in, that's the law they get. You know, in this case, California and Washington, for example, Washington has no right to independent counsel. California has cumulus counsel. That could easily be an issue where that Washington entity goes, hey, why don't I get to pick my own attorney? Well, because the policy says you are a Washington entity and therefore you're subject to Washington law. It becomes a very complicated administration of insurance and I'm sorry for going over. Thank you, Cale. Good morning, your honors. Matt Harvey for Appley National Interstate. We issued the primary policy and the second layer access policy. I am here to talk about 11-580.9, but I do want to just talk about one minor point that came up during my colleague Mr. Colito's discussion with the court. That's the question of whether the National Interstate primary policy named Weyerhaeuser specifically. It did not. It had what we call a blanket endorsement that says if you named insured Gardner Trucking, agree to make somebody else an additional insured under this policy, we're OK with that, but there's a cap on the amount of insurance they get and there's all sorts of limitations. Was there some certificate sent? Exactly, your honor. There was a certificate of liability insurance. It's ER-1228, not issued by my client. This is issued by Gardner Trucking, the named insured's California insurance broker. We did not issue this. But who did it go to? It went to Weyerhaeuser. So it didn't come to you? I'm sorry? I'm sorry. It didn't come to the downstream excess insurers as they were deciding whether to grant insurance or not? No, I don't even have any evidence that this came to my client, National Interstate. It only went from the broker to Weyerhaeuser. And the way that happens, I assume, is that the Gardner reaches out to their broker and says, hey, we've got this additional insured and they want a certificate, and then the broker fires one off to them. Correct. And under the terms, those general terms that you were just referencing in your policy. Correct. And certificates of, it's probably beyond today's discussion, but certificates of liability insurance, they come on these specialized accord forms. And there's all sorts of language that says, this isn't the insurance. This is just somebody saying that the policy exists. You have to go read the terms, et cetera, et cetera. So you heard me asking the chief of counsel about why did California enact this 11-5-8-0.9c? I guess I should be clear about c. Why? So lawsuits like this didn't exist. I mean, literally. So lawsuits like this, where parties are fighting over what's the impact of the language and the different policies, who's going to be primary, who's going to be excess. The courts were sick of that. Well, I guess I'm asking a more specific question. Sure. In the sense that I don't know that the legislature envisioned even thought about probably this idea of self-insured retentions and all of those type. But I'm trying to figure out the more basic question of why the legislature said premises will govern over the vehicle insurance policies. I have a reason in my head. And I'm wanting you to tell me that I'm right. But I'm not going to tell you what it is. I would love to do that, Your Honor. I suspect I have the same reason in my head. I don't have an express answer for you from the case law. But what I can tell you is if, Your Honor, survey the case law about loading and unloading accidents, what you will find statistically is that it is almost always the premises owner's employees doing something negligent that harms the trucking company's employee. Yeah, that's what I was thinking. So I was thinking that if you're an insurance company, I'm guessing the insurance companies went to the legislature and said, listen, as over-the-road insurance people, we don't have any idea where these trucks go, et cetera. It's a lot easier for the insurance that is insuring a premises to know what kind of stuff is going on at that premises and therefore address that risk more. And that's probably. And so the reason I'm getting at that is that if that is the basis for this distinction, then that goes to whether or not self-insured retention should be somehow exempted from it because self-insured, you still want to have the liability placed where somebody is best able to address it and reduce it, which is the premises. But is there any basis for that? Or is it just in my head? I think statistically it bears out there is no express explanation of that's why the rule is what the rule is. But I think that is the most logical explanation. And I can give you two reasons why this statute applies to self-insured retentions, or I should say policies with self-insured retentions. One is just the language. So California law governs. This is a loading and unloading accident. Warehousers, the premises owner are named insured. Our clients named insured is the trucking company, the owner of the motor vehicle under 11.580.9c. That means that Gardner's insurance is all access to warehousers insurance. And that's that's simply what the statute says. There is no limitation to primary policies or any particular type of policy. The premises owner's policies are primary. The vehicle owner's policies are access. And the only argument that's really been raised here is that Warehouser says, well, we can sever the SIR out from our Aspen policy. We can call it a gap in coverage. And then we can demand that the policies the statute says are access should drop down and fill that gap. And although there's no 11.580.9c case that says that, there are California Court of Appeal and Ninth Circuit cases that say that principle is absolutely wrong. So Padilla and Pacific Coast Builders products, or sorry, building products, they both rejected that exact same argument. And I'm usually loathe to read from cases but the Padilla case takes this argument head on. So in that case, it was a construction company. It had a $25,000 SIR under its primary policy, under the relevant primary policy. And it was demanding that its access insurer drop down and fill that gap because it hadn't satisfied the SIR. So what the court said is, no case yet held that an access insurer with an other insurer clause that does not include a specific reference to self-insurance has no duty to drop down until the self-insured retention and any primary insurance overlying that self-insured retention is exhausted. From the viewpoint of the insured, the stage four, that was the relevant primary policy, the stage four primary insurer self-insured retention clause did not provide for a first dollar defense obligation. That is the stage four insurer was not responsible for anything until the $25,000 retention was reached. In other words, and this mirrors Weyerhaeuser's argument exactly, for the first 25,000, the insured really had no insurance from the stage four primary insurer. Since the insured had no other insurance for the first 25,000 of the claim, the stage one umbrella insurers other insurance clause could not operate to make it excess of the stage four primary insurer, at least as to that amount. It was obligated to defend dollar one, there being, after all, no other insurance to pay dollars through 25,000. The flaw in this logic, and this is the holding, the flaw in this logic is the assumption that the self-insured retention can be meaningfully separated from the primary policy or primary insurer's policy, of which it is a creature. In classic insurance law terms, treating the self-insured retention as a separate entity from the stage four primary insurer's policy defeats the reasonable expectations of all the parties, including the insured. It obliterates the distinction between primary and excess insurance. So that language is repeated by the Ninth Circuit in the Pacific Coast Building Products case. It is dead on for Warehouse's argument. It rejects it completely, and it answers the statutory question here. I just wanted to touch- I mean- Sure. I guess the pushback I would have on that is for the person- the primary excess policy says we're going to be primary, not excess, if a contract requires us. So the party's reasonable expectations is a little muddled here because it's not- it wasn't clear at the outset that at least the first person in line was always going to be excess. Well, Your Honor, for different kinds of losses, the result might be different, but for a loading and unloading accident that happens at a premises in California- But that's because of the operation of the statute, not the party's expectations. Well, this statute has been on the books, Your Honor, for 55 years, and I think it's reasonable to think everybody's expectations should have been consistent with what the language of the statute says. And I'd also just point out ever so briefly, the 11580.9 has actually been amended several times, and the only theme one can take away, or lesson one can take away from the statutory or the legislative history is that it shows that any time a court has acknowledged or recognized some loophole in 11580.9, the legislature has immediately acted to close it. So in 79, the Metro case came out. It was certificates of self-insurance. A year later, the legislature amended the statute, said those count as insurance. In 1982- Thank you, counsel. Oh, sure. Thank you. Let's hear from Mr. Corgan. Good morning, Your Honors. Eric Corgan on behalf of Lexington Insurance Company and AIG Claims. And where we fit into the mix is we're the first-level excess auto insurance carrier. Just a couple of quick points on, not to go back to it too long, but on venue, there was Aspen and Weyerhaeuser did not seek mandamus relief. There was no mention of manifest abuse of discretion in their brief. Aspen was the only one that briefed the issue. And on page 33, they say that in order granting a motion to transfer under section 1404A is generally reviewed for abuse of discretion. The Washington District Court correctly applied this court's nine-part Jones test and concluding that on balance, transfer was warranted. I'm moving on to the meat of the choice of law question on the extra-contractual tort claims. The most important factor, really, in this, as for the tort claims, is the fourth factor, and that deals with the center of the party's relationship. And as the District Court found, that strongly favors application of California law in this case. As my colleagues mentioned, Gardner Trucking, the entity that purchased the excess auto policies, is a California company, undisputed, who purchased that insurance through a California broker and purchased that insurance, of course, from California. And there was a question regarding the location of the underlying litigation and whether that's a relevant factor. Some cases, some District Court cases, hold that it is. Others say that it is not. The Polygon case, that's out of the Western District of Washington and the Costco case, say that it is an important factor for the court to consider in evaluating the contacts to the relevant... On the choice of law question, I guess I'm confusing everybody because, in my view, if we can tell that the party's intended for California law to apply, I don't think we consider any other factor. Your Honor, that's correct as to the contract claim, but... The contract claim, yeah. Yes, the extra contractual torque claims that Weyerhaeuser asserted. And did you raise that argument that looking at the Gardner, the national insurance policy contract, it was clear that California law was supposed to apply? On the contract issue... On the contract claim. I believe so. But with respect to the torque claims, no. But that factor is still relevant in looking at the parties, the center of the parties' relationship. And in this court's decision in Lange, the court said that bad faith insurance claims are grounded in... You first look to the contract. It's grounded in the contract. Right, so that's what I'm... Contemplating is that on the contract claim, clearly if the party's intended for California law to apply, that sort of ends the inquiry. And as to the torque claim and the remaining claims, that sort of drives the analysis of where the court should really... Or which law the court should apply, right? That's right, Your Honor. It does drive the analysis, but... Why is that right? Why does it drive the analysis? The factors are different for torque and contract. Absolutely, Your Honor. But the fourth factor that the district court found was the most significant in this case, and it's... Yes, I don't know. So I'm looking at the factors. The place of injury. Well, in a bad faith claim, the place of injury is where the person who didn't get paid is. So that's Washington. Place where the conduct causing the injury occurred. I assume that's where all these insurance companies are located, where they made their decision to not cover. So that's not California. It's New Jersey and all the other places. The resident and place of incorporation, place of business of the parties. Well, we've got Weyerhaeuser in Washington, and we've got Gardner, who's not a party in California. We have the insurance companies not in either Washington or California. Not helpful. Then the last one, where the relationship, if any, between the parties is centered. So the party... Who's the parties? We're talking about the torque claim. Aren't we talking about Weyerhaeuser's and its relationship with all these insurance companies, not necessarily Gardner? Well, it's Gardner. It all relates to Gardner and the accident occurred in... I thought the law was when you had an additional insured, that additional insured is the party to the contract. And that party is not Gardner. It's Weyerhaeuser here. But Your Honor, it doesn't create a whole new body of law as to what applies to that contract. The contract... Look to the contract. That's right. Look to the contract. That's California law. And for consistency purposes here, California law applies to the contract and should also apply to the torque claims. I guess that's the point that I don't... I mean, that makes perfect common sense. Yes. But if that was true, why would we have two lists of different factors? Your Honor, there are different factors, but there is some overlap. And that's the center where the party's relationship is. And California really is the glue that ties all of these parties together. And the insured risk was in California. And also to address Your Honor's point about the location of the insured being the place of injury. That is typically the case. But the district court said, in this case, this isn't the typical injury being sought. The injury that Weyerhaeuser alleges is that it paid more to settle a claim than it otherwise would have paid. And so that's not your typical injury. And therefore, the district court correctly held that that takes it outside the scope of the place of injury is where the insured is located. All right. Thank you very much. Thank you, Your Honors. I did promise to give you a couple of minutes. That will be very brief. Just to pick up where you left off, Judge Forrest. Again, your analysis is completely correct that we examine the tort claims and the context completely independent of the underlying injury claim and of the breach of contract claim. That's what the restatement says. So then what's your take on the last factor, which now the place where the relationship of the parties is centered? Like, what are we looking at there? You're looking at the relationship of the parties, but relative to the claim for insurance coverage, are the insurers acting in good faith when they're sending correspondence to Weyerhaeuser in Washington? And this analysis is laid out perfectly by Judge Robart in the MKB case. He says, we do not look where the underlying injury occurred. We do not look even at coverage under the insurance policy, where it was delivered. We look at the conduct that's an issue on a bad faith claim, which is the correspondence from the insurers to the potential insured and where those contacts were occurring. And so it's the nature, and I admit it's somewhat fuzzy, the nature of a bad faith claim is centered on the conduct between the conduct and the communications between those parties. It has nothing to do with the underlying injury or where that occurred. And again, MKB lays this out perfectly. I want to just quickly address a few- The court's choice of law decision. It's de novo. I want to quickly address my colleague, Mr. Harvey's comments about Padilla and Your Honor's question about what is the statute intended to address? The statute by its very terms is intended to only address a situation when you have concurrent policies, two policies covering the same loss. And if you look at the legislative history that's laid out in the briefing, the issue was you had this kind of who's on first situation where you had primary policies covering the same loss and the insurers would say, it's not us, there's another insurance clause. And so litigation would ensue. And so the statute was designed to set a priority in that situation where you have competing policies of coverage. And so the question, the language of the statute speaks only in terms of policies of insurance. And so the question is, is an SIR the mere reference to an attachment point in the policy, the point at which the policy actually provides coverage? Does that reference to an SIR, is that SIR itself, that uncovered amount, is that actual insurance coverage? And again, the Deere case from the Court of Appeals 2019 addressed that very issue and said conclusively that it was not. The Padilla case referenced by Mr. Harvey that came years earlier talks about exhaustion. It's an exhaustion case. So the question in that scenario is whether an excess insurer can require exhaustion of the underlying SIR and the statements that it can't be severed from the policy in that situation. Those only relates to exhaustion. The California Court of Appeals has already said conclusively in Deere that an SIR is not insurance. And that question is binding on this court as a California decision on that issue. All right. Thank you very much, all counsel. We appreciate your argument. The matter is submitted. We'll take a 10-minute break before we hear the last case.
judges: NGUYEN, FORREST, VANDYKE